Your Honor, Mr. President, this is a morning call to email letters v. Addison Fire Protection District and of the Fire Protection District's Pension Fund. On behalf of the Adirondacks, Mr. Thomas Duda. On behalf of the Addison Fire Protection District, Ms. Erica Thomas. On behalf, excuse me, Mr. Richard Reamer, on behalf of the Fire Protection District, and Ms. Erica Thomas on behalf of the Fire Department. Thank you. Mr. Duda. Good morning, Your Honors. My name is Thomas Duda. And please, the Court, Counsel, just to correct your clerk, Mr. Reamer represents the Pension Fund and Ms. Thomas represents the District. I represent the plaintiff in this case and this is a review of an adverse decision of the Addison Fire Protection District Pension Fund in which I believe a review of the record shows that this decision is clearly erroneous. Which, of course, brings us to the preliminary threshold issue of what is the standard of review to be applied to the issues in this case. Why is it not a de novo review? With respect to the duration of the disability, because all of the medical reports until Dr. Deachen unanimously say that this lady was disabled from performing the duties of firefighting, that was a 14 month period. So as a matter of law, under the definition of permanent disability, on a de novo basis, she would be disabled for that 12 month period. Once Dr. Deachen issued an opinion, which we do not agree that that opinion expressed a medical opinion that she was no longer disabled, but until that opinion was issued, there was no, not only was there not a manifest weight, there was simply no evidence of disability. So that would be de novo. The question is whether the medical evidence, when applied to the definition of disability in the pension code, presents a mixed question of fact and law. My opponents indicate that the Marconi case in the Supreme Court applied manifest weight of the evidence. That's because in that case the plaintiff didn't raise this issue. But Wilford and Knight clearly established that when the issue is does the medical evidence, when applied to the standard of disability, entitle the applicant to benefits, that's a mixed question of law and fact and should be adjudicated under clearly erroneous. On the same issue, should this court apply the manifest weight of the evidence, I think it's absolutely clear that that does not mean, and this court in the Lambert case expressly rejected this, it does not mean that if, quote, there is some evidence to support the decision, it must be affirmed. There has to be evidence which, applied to the record taken as a whole, the opposite conclusion is clearly evident. Doesn't your discrimination claim seem to be somewhat inconsistent with your pension claim? No. Primarily because the district's position with the Illinois Department of Human Rights is that all of the medical evidence reviewed showed that she could not safely perform the duties of firefighting. The plaintiff's position before human rights, before this court, before the pension board is, without reasonable accommodation, I'm disabled. If you would order my coworkers to stop using powdered latex gloves, I believe that my symptoms would stop accelerating, they would abate, and I could do it. I need reasonable accommodation. With reasonable accommodation, I could do the job. Without it, I'm disabled. Well, I asked you a question about your position, and your response was to address the position of the fire department. And in the process of addressing the position of the fire department, you talked about her inability to carry out the job, but you didn't talk about the reason for it or the difference between that burden of proof or issue and the issue that we are supposed to be reviewing, which is whether or not she was disabled based upon some problem or injury that arose out of an act of duty. Okay. Because you never said anything about an act of duty. You never cited to the special language that's contained in the statute. You talked about whether or not she was able to carry out the job. You didn't say why. She could have been run over by a horse and she couldn't have carried out the job. So it's not just the fact that she can't carry out the job, which is what you just said was the fire department's position. There's got to be a little bit more. So let's start all over again and tell me why your position or your client's position isn't inconsistent or contradictory. I apologize to the court. I had perceived the question was, why is your position here different than human rights? But given what, and I'm hoping I answered your question, the plaintiff suffers from latex allergy, which has been under control as a result of chronic exposures to latex during the course of her employment, which is virtually the unanimous or the only source of exposure for her. Over her career with this department, her latex allergy became aggravated. It worsened as a result of these work exposures, and the work exposures occurred while she worked primarily on the ambulance. She found problems when her co-workers would be doing EMS work wearing powdered latex gloves, touch the equipment, she would be exposed to the latex, and she would begin to have symptoms of rashes. She developed some chronic breathing problems. The statute says that her burden is to prove that her disability is the result of an act of duty or the cumulative effects of acts of duty. The job of operating an ambulance, providing EMS care to patients, going to hospital settings, taking patients to the emergency room where she would be exposed to latex, in my opinion, is an act of duty. The cumulative effects of these acts of duties caused the aggravation of her condition to the point that it became, by the admission of the district itself, it became a risk to herself and to others as a matter of safety. I'm hoping that answered the court's question. I thought in the discrimination claim, your client claimed that she was capable of carrying out her duties. If the district would order other workers to stop using latex, would change the gaskets on its equipment and remove the latex from the immediate work environment that she operated in, she and her doctor believed that she could do the job. Without the accommodation, she couldn't do the job. That is what I was trying to make to the court, was her position to all of these agencies has been the same. And the district's position, and later in my argument, I'm going to argue that statements made by the district based on the medical reports that it obtained are evidence. They're evidence. I don't think they're binding in the sense that they're not collateral estoppel, but they're evidence. Because these are statements that are made by the employing unit, whose job it is to determine if she in fact is able to do the job or disabled. And under oath, filing documents with a governmental agency, they expressly stated that based on the medical information available to them, she is disabled from performing the duties of a firefighter. And that is why we cannot accommodate her condition. That is a statement that, in my opinion, is part of the record. It's part of the manifest weight of the evidence. It's part of the record for clearly erroneous purposes and has to be given weight in adjudicating whether or not the decision of this pension board was clearly erroneous. I hate to throw you off again, but I'm struggling with the facts of this case versus the facts of the Dower case. And how do you distinguish the two cases? I mean, the Dower case where it said it's okay if you have two different claims going, that it's all right to say you're disabled. You can't work here because you're a threat to yourself or others on the job. So on the disability or on the pension claim, and then you have a discrimination claim, and they may rule one way on one and one way on the other. Inconsistent. Well, first of all, Dower's been legislatively overruled. 4-112, approximately 8 to 12 months after the Dower decision amended the pension code to provide that a finding that a disability no longer occurs creates a conclusive presumption that the firefighter is physically able to do the job and the employer is obligated to return them to work without examination. In the event that that doesn't happen, they have a right to a civil lawsuit and they receive attorney's fees and costs. Number two. Does that then mean that if the fire department did what your client is requesting and removed latex gloves and latex gaskets, and then requested that your client return, if she didn't return, she would then not be allowed to return and would not be allowed to sue on the basis that your alleged accommodation would suggest that she has now been capable or she is now capable of handling the job, but she hasn't decided to do that? Yes. My client testified before the board. She gave a statement to the Department of Human Rights. If you would remove the latex from my coworkers and you would change the gaskets, I would love to return to work. My client is currently working as a teacher, but I guarantee if the district were to do what the court suggested, she would resign that position and report to work Monday. And what if they did those things and she still had problems? Then what would happen? Then we'd have to revisit the issue. But, Your Honor, I think that the possibility that medical conditions in pension cases change is provided for in the statute. For a young firefighter under the age of 50, even where they're found disabled, they're annually examined because our experience in life is that medical conditions change over time. People get better. People heal up. And that would have been my preference. I mean, the way this thing happened wasn't that my clients brought in a doctor slip asking for time off of work. My client made a passing comment to her lieutenant saying, you know, all of the latex that these other fellows are using is really making my condition worse. I'm starting to have breathing symptoms. Could you talk about everyone using nitrile gloves? And I think it would be better for the patients, for the people we serve. He says put that in writing. She puts it in writing. And then all of the examinations transpired at the insistence of the employer that led to the multiple examinations by the employer. The employer writing a letter saying either resign, apply for disability, or we're going to fire you. And then the examinations by the pension fund. But prior to the examinations, they told her you're going to have to leave work until? Correct. And oddly enough, the argument of the pension board is that somehow that fact pattern operates to the detriment of the plaintiff. That the plaintiff never asked to be removed for work, so how can she be disabled? Well, the simple answer to that is she articulated the increase in her symptoms as a result of the cumulative effects of the exposures. The employer then took that information, ordered examinations, and said our doctors, including Dr. Cole, including Dr. Cole, say that you are a danger to others and to the people that we serve, and we won't let you work. I believe that that fact pattern establishes entitlement to line-of-duty disabilities under 4-110 of the pension code. The medical evidence, contrary to the argument of the defendant board, is not all over. The board's position is that there's conflict of medical evidence in many cases, and our job is to sort through the medical disputes and resolve them. In my opinion, there is no medical dispute here. Beginning with the very first doctor who heard about this case, Valerie Phillips, she never saw the client, she gave no opinion, but she did provide the district with extensive literature, which is in the record, outlining how the disease of latex allergy in a work setting operates, that people who have latex allergy can, due to chronic exposure, increase their disability, make their condition worse, and she gave that literature to them, gave some names for people to examine. The district had the client examined by Dr. Ebert, by Dr. Cole, and Dr. Moisen. It is true that Dr. Cole wrote a report that said she could return to work, but when one reads Dr. Ebert's report, and particularly emails that are found on pages 606 and 959 of the record, he talked to Dr. Cole, and Dr. Cole retreated from that position. So the district then writes to Human Rights, says it's dangerous for her to continue working, they write to her saying if you don't apply for disability or quit, we're going to fire you. She applies for disability, she's seen by three doctors. Two of the three doctors unequivocally say as a result of the exposures at work, she can't be a firefighter anymore, and Dr. Deachin does not give the opinion. Dr. Deachin in none of his reports says that she is not latex allergic. He says I can't give a definitive opinion because the tests are negative. Is it consistent, and I think based upon what the other doctors have testified to, is that once you remove yourself or extricate yourself from the exposure to the latex, that then your latex allergies or the results of testing latex allergies are going to be diminished? Her condition, her symptoms diminished once she was removed from this particular exposure. Although in her day-to-day activity she did still have some reactions to balloons at a kid's party, but no, her condition improved. The record is silent. Would that mean then the testing results would be diminished? To be honest with the court, that's really not in the record. What is in the record is that the tests are very imprecise, that they have a 50% false negative. I thought it was 20%. 50% according to Dr. Pollack. I quoted his report in my brief, and I apologize to the court. I'm pretty sure it's 50%. If it has a 50% false negative, then it means that the test is 50% accurate? Correct. What it means is that if you test positive, you have the allergy, but if you test negative, you have to work elsewhere. And Dr. Pollack's opinion is fully supported by all the literature provided by Dr. Phillips. So it's 50% of the 50% or 50% of the negatives. And what is the percentage of negative testing? Dr. Pollack's report says that immunoanalysis reveals a false negative result in 50% of the tests. Now, I can't tell the court that I know that that's the percentage that NIOSH, the National Institute for Occupational Safety and Health, I haven't read it that closely to know what percentage they indicate are negative. But the NIOSH literature says that you can't rely on testing. The other important thing is that the board, in its brief, argues that we found Dr. Deachin very persuasive because he was the only doctor who administered tests. That's not true. Dr. Ebert examined the patient October 19, 2008, and said, we need testing. He then had the plaintiff go to her doctor, who is a board-certified allergist, and Dr. Bonsall conducted the tests on September 22nd and faxed the results to Dr. Ebert. And Dr. Bonsall and Dr. Ebert relied on objective testing in support of their position. So the argument of the board that the reason that Dr. Deachin is so persuasive is because he's the only one who ordered a test simply isn't consistent with the record. Did Dr. Deachin review all the other reports before he gave his report, and he still found that he had no evidence to confirm her history of white techs? That's what he said. And he said, I hope that she would be able to return to work within a level of exposure to latex that is safe. And there are two parts of that statement, is that I don't believe that that is an opinion expressed within a medical degree of certainty. But more importantly, the district says we have no control over the level of latex exposure that our firefighters are exposed to. Now, if what the district said under oath is true, then the fundamental basis of Dr. Deachin's opinion is not supported by the record, and the one opinion upon which the board relied evaporated. I think I'm getting close to my time. Well, your time is up. We didn't talk about consolidation, but if the court has questions, I'd be glad to answer them. But I don't want to overstay my welcome. Well, it's my understanding that the consolidation of the other case has not been resolved as of yet. Is that correct? No, the consolidation was refused. No, I'm saying the case that you wanted this case to be consolidated with is still pending. And it presents the issue as depending on how this court decides this appeal, what effect it will have on the pending litigation. Anyway, thank the court for its time and attention, and I appreciate it. Thank you. Good morning, members of the court. Richard Reamer on behalf of the defendant, Apple Lee, the Addison Fire Protection District Firefighters Pension Fund. I'd like to, for the court, please, I will take ten minutes and allow Ms. Thomas to respond on behalf of the district, if that will be okay. First of all, obviously, I think the threshold issue here is what standard to apply. Justice Shostak asked, does the NOVO apply? I don't think that the NOVO standard is in play here. I think it's one of two things. It's either the manifest weight standard or it's the clearly erroneous standard. I think the Supreme Court and all of the appellate court cases have found that. I think because of the new facts of this case, no matter what standard you apply, it must be affirmed. Whether you apply the manifest weight standard, a question of fact, or whether it's a mixed question of law and fact. And just to respond to some things Mr. Duda said, one of the issues raised in the brief, which I, with all respect, I think that's a red herring. This issue of permanency, and that might have been Justice Shostak's question about permanency. Permanency, I think, is a question of fact, too, not necessarily a question of law. And there was a 14-month period that the plaintiff didn't work. But that wasn't, I don't think not working and being disabled on a permanent basis is the same thing. I think there's two separate concepts here. Because if you recall, part of the facts here are, is during the time period that the pension board, particularly Dr. Deachin, was trying to have the plaintiff examined to verify whether or not there was this latex sensitivity or allergy, was the fact that the plaintiff was pregnant. So wasn't able to do it for, I believe, patient safety reasons. So, again, not working and being disabled, if you look at the definition of permanency in 4-105B of the pension code, it requires that the disability be permanent. So you need to still have a disability. And really the finding of the board, very simply, was there was no disability. So why did they, they're not having a problem with this, I'm going to be honest with you. They said, you're saying there wasn't a disability. And my question is then, why did they terminate her and say, not terminate her, but say, you're going to have to go home because, or they did terminate her at some point and say, you're a danger to yourself or others, and not make the accommodation. Why wouldn't they just make the accommodation? Why did they find her unfit for duty? Judge, my role, obviously, is as the pension board. So we, quite frankly, I'm not trying to dodge the question. I don't think the pension board has a dog in that context. Oh, okay. So, all right. I think that you might want to address that to her. So our focus is the pension board is Article 4 of the pension code, determining whether or not there's a disability. And, again, I think the record is clear. There has to be some evidence, competent evidence in the record. And I think what Mr. Duda suggests in his brief is not correct. I don't think the Wade decision says that there can only, only one doctor is not sufficient. We do have more than one doctor here. We have Dr. Koh, initially, who was an independent doctor selected by the district, the employer. But we have Dr. Deachin. And Dr. Deachin, of all the doctors that rendered opinions in this case, Dr. Deachin was the only doctor that had the benefit of reviewing all the medical records, the initial tests that were performed by the treaters, the tests that were performed by the district's medical examiners. Dr. Deachin bent over backwards to try to verify, initially performed some tests. The other two pension board doctors, you recall, there's three doctors that the board has allowed to peck, Dr. Pollack and Dr., I think Dr. Orris. They didn't perform any tests. They did review the records. But those doctors didn't see the extent or go to the extent that Dr. Deachin did, who, no question, his credentials, board certified in allergy and immunology. He initially did some tests that were negative. He wanted to do repeat tests because the plaintiff was pregnant. The tests couldn't be performed. Dr. Deachin performed all those tests. I think Dr. Deachin bent over backwards. He performed all the tests that all the doctors say are the type of tests that would be used in the field to diagnose or rule out or confirm a latex allergy or sensitivity. He did a skin patch test, a RAS test. He did a blood test. And he did what's called a true test, and this was, again, sometime after the plaintiff had her baby and was able to come back and submit to those tests. So that kind of explains the delay in the time period. So you indicated to Dr. Deachin, and I think I asked your opponent this question, Dr. Deachin was the absolute last one to evaluate her. He had every single report from every doctor that has ever evaluated her with respect to this pension. And he said, quote, the diagnosis of latex allergy in this case is in serious doubt. I have no evidence to confirm her history. Wasn't her history, her self-reported and the doctor's evaluations of her reported history, replete throughout those medical records? So what type of credibility do we have when Dr. Deachin said, I have no history? Well, to answer the question, yes, I believe Dr. Deachin was in the unique position, unlike all the other doctors because he had everything, all treating records, all examining records, and he was the person that did the most recent set of diagnostic tests that even Dr. Bansal, the treater, said these are the tests relied upon in our field to diagnose and rule out these types of issues. But to answer your next question is what credibility does he have? He has all the credibility. He reviewed all those credibilities. He bent over backwards to give the plaintiff the benefit of the doubt. And when he tried to, again, confirm the tests, remember, initially he did tests in 2009, and then he suggested he couldn't come to a conclusion. He says, I need to repeat the tests. They requested that the tests be repeated due to her pregnancy. She wasn't able to complete those tests. We understand that. By the time she was recovered healthily and happily, I hope, had her baby, she was able to come back, he did the repeat tests, all the tests that the experts say are the type of tests you use, and he said negative. I cannot confirm, and it's in serious doubt. I think he said, his words were, I didn't bring my brief here. I think he said, I hope and anticipate or expect that she should be able to return to full and unrestricted duty. I think that Dr. Koh and all the other issues that the board relied upon in making this finding that she was not permanently disabled, the fact that she never did miss a day of work, the fact that she never requested time off, never went to a supervisor and said, I need to go home because of the fact that I'm having an allergic reaction, the fact that she had no symptoms since she left work, the fact that during her annual medical exams that the district required during the four years before this incident came to rise, there was never any problem with the latex allergy. Do you think she would have applied for disability had they made an accommodation? I mean, had they not put her in a trick bag and said, hey, either you apply for disability or you're fired? I don't know. I can't answer that. So I guess my question to you is that the facts that you're putting forth about her being a good employee, she didn't complain, she didn't take time off, she was kind of put in a trick bag, wasn't she, Mr. Reamer, in that they said either you apply for disability or you're gone. So that may not have been her first choice. I would agree with that. As far as whether I would characterize it as a trick bag, I don't know. I can tell you, you know, I have respect for Mr. Duda. I don't always agree with him. I'm sure he gave her what counsel he thought was appropriate. But, again, you asked about the Dowrick case. I think Dowrick's good law. Your opponent says that the statute was amended and would overrule Dowrick. I would respectfully disagree with that. First of all, I think Dowrick is still good law, and good law. Dowrick, rather, as you know, this Court's opinion, stands for the proposition that if you have a pension board deny somebody a line of duty disability claim, which is what happened in Dowrick, the firefighter, and then sometime later the district has problems with the employee, the employee doesn't do what the fire department in that case wanted him to do. They were able to fire him, and this Court said that's not inconsistent. It may seem incredulous, but you can have those types of situations. But to answer your question, if I could, about has it been overruled, I would also respectfully disagree with Mr. Duda on that. What Section 4.1.12 was amended to say is if a firefighter who is found who had recovered from a disability must be reinstated to the fire department within 30 days, otherwise there's punitive damages. It doesn't say a firefighter who's denied a disability, which is what we have here, and I think there's two serious differences here. If the case was we had granted firefighter Edwards a disability and then she recovered and we ordered her to go back, if the district didn't reinstate her, I think that's what Mr. Duda was talking about. That was the legislative amendment. But I would disagree with him on that. Finally, I don't want to run out of time or stuff on Ms. Thomas' amendment. Doesn't it make a difference what the facts are upon which the pension board's decision is made? If the pension board decides that there is no disability because there is no disability, then how can the fire department claim that someone can't work for the fire department if they have been party to litigation where it was found that what they are claiming, which is this person has a disability, when the pension board found they didn't? I think that's DOWRIC, Judge. I really do, Your Honor. I think that's a DOWRIC case. Could that happen? But, again, the pension board only is concerned with Article IV of the Pension Code and trying to determine whether or not there's, in fact, a disability. And I think they did that. And I think I'm running out of my time. I'd be happy to answer any questions. I would respectfully request, then, that you affirm the decision of the Honorable Judge Biden-Wheaton, as well as the board. Thank you for your time. Ms. Thomas? Good morning. First of all, I'd like to say that the district does adopt all the arguments that have been presented today by the board. Although the district did not take a position at the administrative level about whether or not the plaintiff should or shouldn't have been granted a disability pension, the district does feel strongly that the administrative process that has been put into place to review pensions, such as the one before the court, should be given great deference, and the board's decision should be given great deference by this court. So if she didn't have a disability, why terminate her, saying she was a danger to herself or others? The district did not terminate her, Your Honor. They did, in fact, put her on an administrative leave. And I'd like to answer that question fully, but I'd like to initially state that whether or not she could or could not be accommodated was not an issue before the pension board. What was before the pension board was whether or not she had a permanent disability that prevented her from performing the duties of a firefighter. They did not have to consider accommodation. That is the other lawsuit that Mr. Duda was trying to attempt to consolidate this case with. As far as the accommodation itself, Your Honor, although this is, in fact, I would say outside the administrative record here, the district's position and the doctor's advice to the district was they have no control over anything outside of the fire department itself. Yes, there could have been nitrile gloves in every single ambulance. Yes, every single thing in that ambulance could have been made latex-free. Everything in the district facilities could have been made latex-free. But what happens when she gets called to a birthday party where somebody is having a heart attack and there's balloons everywhere? Did she ask for anything other than nitrile gloves? She did not. But, again, the district cannot... Can't control the environment where she might have to go in order to respond to a call. That's exactly right. So, all right, maybe the gloves would have helped. But what happens if she gets into an emergency situation and her condition endangers others and herself? What if she's out there by herself or with a partner and someone dies because of her allergy or her condition? And, again, I really feel this is very far afield of what the pension board had to consider, but certainly that's where the district had to... They had to consider the entire world. They could not just consider the gloves. So that is really the situation. Mr. Duda makes an argument about that the pension board had to consider the district's opinion about the allergy itself. Well, quite frankly, that's really not the case. The pension board should not have given any weight, quite frankly, to the district's opinion because the pension board had the records that the district reviewed in front of it. They could make their own decision, they could review those records, and they could come to their own conclusion. First of all, the district was looking at the entire world, and the pension board had to consider whether she was disabled from performing firefighting duties. There was, quite frankly, no evidence that she ever had difficulties performing those firefighting duties. She herself testified that she did not have any problem performing those firefighting duties. So then why couldn't she stay employed by the fire department? Because the doctors indicated, the occupational doctors indicated, that if there is a situation out there where she does run into a substantial exposure to latex, she could, in fact, be a danger to herself and others. So, therefore, she can't perform her firefighting duties. Correct? No. That is only, on a daily basis, she could have probably performed those, she could have performed those firefighting duties. She said she could have. But on an incidental basis, it's possible that she couldn't have. And that's not what we're here about. We're here about a permanent disability, not an incidental disability. That is where the line is drawn. So that's where the district was concerned, but the pension board didn't have to determine whether or not there's an incidental disability. So that she could work as a firefighter and then, in a certain incident, if she couldn't go out to the children's birthday party, she'd stay behind at the fire department. I guess, but what if she was the only one on duty that day? Is there a case law that comes close to this special scenario? Well, not under the pension, the Illinois Pension Code, but there are substantial cases out there concerning accommodation and consideration of allergies. And an allergy, even a peanut allergy, has been considered by courts that is only incidental, is not considered a disability for accommodation or for IDHR or EEOC purposes. So there is that case law, but not with regards to the pension issue. And I'd also like to point out, Mr. Duda misquoted the statement that the plaintiff made to the IDHR. Her statement, and I quote, is, My physical disability is unrelated to my ability to perform the essential functions of my job with or without a reasonable accommodation. And that's found at C887. Mr. Duda indicated that she made that statement with an accommodation, but she unequivocally says, I can do this job with or without an accommodation. And that statement, under oath, as Mr. Duda keeps pointing out, that the district's documents were under oath, her statement was also under oath, and the pension board had to consider that as well. Thank you very much for your time. You indicated that the district did not terminate her, right? That's correct. I thought in the letter of December 16, 2008, it says, The district, therefore, has no option but to seek your termination. The district did not seek her termination. After that, they didn't? They did not. They did not. She's still technically, I guess, on the rolls. Okay. Although, again, outside the record, but. Thank you. Anyone else have any other questions? Thank you very much. Please, the court. They didn't seek her termination. She's on administrative leave pending the outcome of this case. I have to address Dalryk. Well, is she also on administrative leave pending the discrimination case as well? I haven't seen anything in writing, Your Honor. The representation that was made at the pension hearing from the district was, She's not terminated. She's on administrative leave. I assume that to mean pending the outcome of this. Well, my point is that she could be on administrative leave without clarification as to why. It could be without specification as to which litigation one or both are dependent or should be resolved before the administrative leave is discussed. It could be as ambiguous as most judicial orders that say until further order of court or until further order of the police chief or whatever. Could you be more specific as to the lack of clarity in whatever you received as to administrative leave? The only comment made in the hearing is that she's on administrative leave, period. Okay. Thank you. To be clear, I don't want to mislead this court that I know what comes after the period. It just says period. Thank you. You can address Dalryk. There's two things about the Dalryk case. Number one, Dalryk was the issue was raised judicata and collateral estoppel. And the dicta that's relied upon by the district and by the board relates to the fact that in the termination proceeding, the finding of the pension board was held not to be collateral estoppel or raised judicata. Number two, there was a four-year hiatus. Mr. Dalryk was denied disability. He was allowed to return to work and then was terminated four years later. So the contemporaneous medical evidence and the statements of the employer were not part of Dalryk whatsoever. He was denied a pension. He returned to work, and then he got fired four years later. And this court's holding is dependent on the doctrine of raised judicata. It's not dependent on whether or not the behavior of an employer in a disability case is relevant evidence as to whether someone is or is not disabled. How do you respond to Mr. Reamer's response to you about 4-1-12? It does say recovered. But in my opinion, it clearly shows that the General Assembly wants there to be a connection between the factual findings of pension funds and the employing unit. It does read someone who recovered from a disability. And the question is, when the General Assembly wrote it that way, did they mean to isolate it for someone who was simply denied, or it only applies to people who were at one time granted and then were found that they had recovered? And then finally, in terms of Dr. Deachin, it is not true that he's the only one that had all the records. Dr. Orris, Dr. Pollack, and Dr. Ebert and Dr. Bonsall had all of the records. The only thing Ebert didn't have was Dr. Deachin's report. Dr. Bonsall had her own objective tests. She had Dr. Deachin's tests, and she testified in person that, again, that these tests are intensely unreliable in terms of if you have a negative, it doesn't prove you don't have the allergy. And there's no evidence that once you have the allergy, you recover completely. This has been documented. In fact, if you read Dr. Ebert's report, Dr. Moysen's report, Dr. Pollack's report, and Dr. Bonsall's testimony, she's been diagnosed with this allergy since she was a little girl. She was diagnosed with it at Northwest Community Hospital. They knew that she had it when she was hired here. And then the last thing, the idea that the cumulative effects of her exposures didn't contribute to the disease, she had the allergy when she was hired. She functioned on ambulances with coworkers using latex gloves until her symptoms increased. And it is true she didn't ask to be taken off of work, but she was the one who reported to her supervisor, my symptoms are getting worse. Anyway, I... You can see the quote that Ms. Thomas made relative to the site? I can see that in the opening, what she filed with the Department of Human Rights, she read it correctly. But when the court reads the, I think it's in there, the notice from the department, I think there's a talk of reasonable accommodation. But her doctor testified that she could work only with reasonable accommodation. But I do agree that counsel read what was filed correctly. Any other questions? You made a statement at some point about her experiencing shortness of breath and so forth. Dr. Koh refers to that and says that that shortness of breath was not from allergies, but that your client attributed it to exertion and non-latex allergies. Where does he get that, from your client or from somewhere else? The answer is I'm not sure where he got that. And that was in his October 10th letter. And there seemed to be, there were two other letters with Dr. Koh, and then there was a verbal exchange, which is found at 606 and 959. I can't answer the court. Did your client make that statement some other place, that the shortness of breath was not from, was more from exertion than the latex? I don't know the answer to that. Thank you. Anything else? No. We'll take the case under advisement. There will be a short recess. That's the case of the call.